BILLIE H. SMARTT AND MARGARET A. SMARTT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smartt v. Commissioner
Docket No. 19221-90
United States Tax Court
T.C. Memo 1993-65; 1993 Tax Ct. Memo LEXIS 68; 65 T.C.M. (CCH) 1962; February 25, 1993, Filed *68 Decision will be entered under Rule 155. P was involved in the real estate development business. P assisted A, through a partnership, in achieving the necessary financing to purchase the Baptist Road truck stop, from which P's partnership received rent. P and A formed a corporation, SH&A, to purchase two other truck stops, Barstow and Fountain, from S. P made subsequent advances to A to meet the expenses of Baptist Road and Barstow. P also incurred obligations on behalf of Baptist Road and made payments to S pursuant to a settlement agreement. Held, advances made to and obligations incurred on behalf of Baptist Road qualified as business bad debts under sec. 166, I.R.C.Held further, advances made to Barstow and settlement payments made to S were investment oriented and thus did not qualify for deduction as business bad debts under sec. 166, I.R.C.Held further, P's initial contribution to SH&A did not qualify for deduction under sec. 1244, I.R.C., as a loss from small business stock nor for deduction under sec. 166, I.R.C., as a business bad debt. For petitioners: Terry F. Satterwhite and Steve D. Noecker. For respondent: Richard D. D'Estrada and Ann M. Welhaf. *69 PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1984
$ 71,334
1985
87,212
The issues for decision are: (1) Whether petitioners' losses from bad debts for tax years 1984 and 1985 are losses from nonbusiness bad debts entitled to short-term capital loss treatment, or losses from business bad debts entitled to ordinary deduction treatment; and (2) whether petitioners were shareholders in SH&A Enterprises, Inc., entitling them to a deduction of their initial contribution to the corporation as a loss on small business stock under section 1244. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, is incorporated herein *70 by this reference. At the time they filed their petition, petitioners resided as husband and wife in Colorado Springs, Colorado. References to petitioner in the singular are to Billie H. Smartt. Petitioner has been engaged in real estate development in Colorado Springs since 1951. He graduated from Colorado College in 1952 and obtained his real estate license in 1954. In 1951, petitioner formed Smartt Construction Co. The company's developments have included significant residential and commercial real estate projects involving a total of 8,000 to 10,000 acres, 18 to 20 subdivisions, and at least 2,000 homes. Petitioner received salaries and bonuses from Smartt Construction Co. during the years in issue. Petitioner's ability to obtain financing for his developments was dependent on his good credit history. In addition to his credit history, petitioner's significant business dealings and contacts in the community afforded him a large borrowing capacity. By the early 1980's, petitioner's borrowing and pay-back capacity was between $ 8 and $ 15 million. His focus on commercial developments included a series of transactions involving the I-25 Partnership, SH&A Enterprises, Inc., *71 and three truck stops, from which the amounts at issue originated. In 1978, petitioner met Bobbie Anderson (hereinafter Anderson), who was interested in obtaining a truck stop between Chicago and Los Angeles. To help Anderson obtain the necessary financing, petitioner formed the I-25 Partnership. Petitioner acted as general partner and owned a 40-percent interest. James E. Higby, who contributed the land on Baptist Road, owned a 40-percent interest, with the remaining 20 percent being owned by Donald E. Bloor. The partnership borrowed $ 675,000 from Columbia Savings and Loan of Colorado Springs (hereinafter Columbia Savings) with each of the three partners personally signing the mortgage. On September 1, 1978, the I-25 Partnership entered into a lease agreement with Anderosa Corp. (hereinafter Anderosa). Anderosa was formed by Anderson to lease and operate the Baptist Road truck stop (hereinafter Baptist Road). [2] Under the lease agreement, Anderosa agreed to lease the premises for a term of 22 years commencing January 4, 1979. The agreement also granted Anderosa an option to purchase the property from the partnership. On July 20, 1979, Anderosa began operating the truck *72 stop. In 1981, petitioner, Anderson, and Terry Harris formed SH&A Petroleum, a Colorado general partnership. The partnership, which acted as a supplier for Anderosa, owned three service stations and a bulk plant. During 1981, Silco Oil Co. (hereinafter Silco), which had a business relationship with SH&A Petroleum, approached Anderson and her brother concerning the purchase of some of Silco's truck stops. In response, Anderson formed a new corporation, SH&A Enterprises, Inc., to complete the purchase. Petitioner and Anderson each contributed $ 50,000; Anderson's brother, Gregory, contributed $ 10,000. Although he held the office of vice president, petitioner's duties and involvement were limited to an advisory role. For reasons set out below, we find petitioner was a creditor of SH&A Enterprises and not a shareholder. On September 1, 1981, SH&A Enterprises and Silco entered into an agreement in which SH&A agreed *73 to lease the Fountain, Colorado, truck stop (hereinafter Fountain), and lease and purchase the Barstow, California, truck stop (hereinafter Barstow). Under the terms of the agreement, SH&A Enterprises purchased all of the stock of Tomahawk Oil Co. of California (hereinafter Tomahawk), which operated the Barstow truck stop, from Silco for $ 68,400. In accordance with the agreement, SH&A Enterprises also guaranteed four promissory notes from Tomahawk shareholders in favor of Silco and three individuals. On behalf of SH&A Enterprises, petitioner guaranteed two of the four promissory notes. In addition, SH&A Enterprises agreed to pay the following cash indebtedness owed by Tomahawk to Silco: (1) An immediate cash payment of $ 43,160, (2) a $ 150,000 promissory note, and (3) a $ 221,512.94 promissory note. Petitioner individually guaranteed the Tomahawk stock purchase and personally signed on the $ 150,000 note. However, petitioner did not guarantee the $ 221,512.94 promissory note. On November 1, 1982, the $ 221,512.94 promissory note was canceled and a new note, in the amount of $ 324,369.78, was executed in favor of Silco with petitioner's personal guarantee. The new note was *74 executed to pay outstanding debts of the Fountain truck stop and to settle a disagreement over the amounts owed to Silco and Tomahawk under the original $ 221,512.94 note. A $ 2.5 million promissory note, dated December 1, 1982, was executed by SH&A Enterprises for the purchase of Barstow. The guarantee for this note was executed by petitioner, along with Bobbie and Gregory Anderson, on September 8, 1981. The Fountain and Barstow operations never got off the ground. Neither truck stop pumped the amount of fuel originally anticipated and consequently lost money. Because of increased difficulties in maintaining its financial obligations under the Silco agreement, SH&A Enterprises decided to dispose of its interests in the unprofitable stations around early 1983. On February 15, 1984, the Fountain lease to SH&A Enterprises was terminated by Silco. In March 1984, Wray's Petroleum Co. (hereinafter Wray's) purchased Barstow. After several months of operations, Wray's filed a voluntary petition under chapter 11 of the United States Bankruptcy Code. The bankruptcy was converted to chapter 7 on April 10, 1985. After SH&A received Barstow back from Wray's, petitioner advanced funds *75 in 1984 and 1985 through either Anderson or SH&A Enterprises to meet Barstow's expenses, including rent and mortgage payments. Petitioner's advances were to be repaid on any subsequent sale of Barstow. [3] During tax year 1984, petitioner advanced funds to Anderson to cover Barstow's expenses. [4]
After SH&A Enterprises received Barstow back from Wray's, the truck stop was completely depleted. All of the equipment and inventory had been *76 sold. As a result, SH&A Enterprises turned the truck stop back to Silco as the noteholder. Silco claimed breach and default, while SH&A Enterprises counterclaimed fraud, misrepresentation, and improper accounting of lease payments. On March 31, 1985, the parties entered into an Agreement for Mutual Release and Settlement of Claims. [5] The settlement provided for the following: (1) $ 100,000 payable to Silco at the signing of the Agreement; (2) $ 267,745.59 payable to Silco pursuant to a note; (3) Return of Barstow to Silco by quitclaim deed; (4) All of the notes concerning the purchase of Tomahawk's stock, Tomahawk's indebtedness and the $ 150,000 and $ 221,512 notes to Silco were marked paid; (5) The note for the purchase of the Barstow truck stop in the amount of $ 2.5 million marked canceled; (6) The mutual release of all claims between the parties. Petitioner paid the $ 100,000 payable at the signing of the settlement and an additional $ 47,646.80 pursuant to the promissory note provided by the settlement agreement. At the time of the settlement, petitioner was not in the best financial situation and thus executed the agreement to avoid additional litigation and public *77 exposure of the default. Petitioner was also experiencing financial difficulties with his original investment in the Baptist Road truck stop. Despite its initial success, Baptist Road faced a downturn at the end of 1984 and needed additional funds to pay its rent. Anderosa had fallen behind on its rent payments to the I-25 Partnership. The partnership refused to reduce, waive, or rebate the rent for Anderosa. Consequently, petitioner loaned Anderson money to pay a portion of Anderosa's rent and expenses during tax year 1984 and an additional $ 10,000 in 1985. [6] If the truck stop had gone out of business because of the absence of a lessee, the I-25 Partnership would not have been able to meet its mortgage obligations to Columbia Savings. Petitioner believed that if the partnership *78 defaulted on this mortgage, his ability to finance his real estate developments would be jeopardized. In January 1985, Anderosa's checks began bouncing because United Bank had emptied Anderosa's accounts to make a principal reduction on SH&A Enterprises' line of credit. Anderson had borrowed on this line of credit to cover Barstow's bills. SH&A Enterprises and Anderosa were cross-collateralized, giving United Bank the right to apply funds from Anderosa's accounts to SH&A Enterprises' loans. United Bank threatened to enforce a lien on the personal property (equipment) at Baptist Road unless SH&A Enterprises paid its line of credit. However, the bank agreed to return the money to Anderosa's accounts and not enforce its lien if petitioner signed, cosigned, or guaranteed the line of credit. [7] Accordingly, petitioner executed a note in order to keep Baptist Road operating and thereby prevented the lessor, I-25 Partnership, from defaulting on the $ 675,000 mortgage with Columbia Savings. The *79 amount of petitioner's payments under the note is in issue and is discussed below. Despite petitioner's efforts, Baptist Road continued to perform poorly. As a result, on February 25, 1985, the I-25 Partnership served a Notice of Default and Demand for Payment of Rent on Anderosa for the Baptist Road truck stop. After Anderosa vacated, the I-25 Partnership assumed the operations of the truck stop, utilizing employees of Smartt Construction Co. Neither Anderson, Anderosa, nor SH&A Enterprises repaid any of the amounts advanced by petitioner on behalf of Baptist Road. Respondent issued a notice of deficiency on May 25, 1990, for tax years 1984 and 1985. In the notice, respondent reduced the amounts shown as Schedule C business bad debts on Form 1040 by $ 153,471 in 1984 and $ 207,836 in 1985 because it was not established that such debts were sustained in a trade or business. OPINION
*80 Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1984 and 1985. Respondent's determination is presumed correct, and petitioners bear the burden of proving respondent erred. Where the record is unclear or devoid of evidence to substantiate a claim, petitioners have failed to meet their burden. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Preliminary Issues
Before addressing the two main issues under sections 166 and 1244, we must first address two preliminary issues: (1) Whether petitioner was a shareholder in SH&A Enterprises in order to qualify for the section 1244 deduction, (2) the amount of payments actually made by petitioner to United Bank, and (3) the amounts petitioner actually advanced to Anderson in 1984 on behalf of the Baptist Road and Barstow truck stops. In order to qualify for a deduction under section 1244 for losses on small business stock, a taxpayer must own stock in a small business as defined in section 1244(c)(1). Sec. 1244(a). In the case at hand, petitioner and Anderson each contributed $ 50,000 to the formation of SH&A Enterprises in 1981, along with Gregory Anderson *81 who contributed $ 10,000. Petitioner held the title of vice president of the corporation, yet Anderson testified that he was only a "valuable advisor". During respondent's field audit, petitioner, his accountant Rick Brown, and Anderson informed Revenue Agent Joe Gonzalez that petitioner was not a shareholder in SH&A Enterprises. Furthermore, in 1981, petitioner accounted for the $ 50,000 contribution as a receivable, as opposed to a stock interest. Finally, petitioners failed to claim a section 1244 stock loss on their 1985 tax return. However, petitioners introduced a stock certificate dated August 1, 1981, which clearly indicates that they owned 34,091 shares of no-par-value SH&A Enterprises common nonassessable stock. The stock certificate was retained in the corporate books of SH&A Enterprises. However, there is no proof that the certificate was ever issued to petitioners. It was not until petitioner learned of the stock certificate -- a point in time of which we are uncertain -- that he claimed he was a shareholder. The contradiction in testimony and evidence leads us to conclude that petitioner has failed to meet his burden of proof. Accordingly, we find petitioner *82 was a creditor, not a shareholder, in SH&A Enterprises. Second, the parties are in disagreement as to the actual amount paid by petitioner to United Bank. Petitioners assert that their total payments equal $ 54,743.43. [8] To the contrary, respondent contends that the documented payments of petitioner equal $ 37,460.98, comprised of principal and interest, and the remaining $ 17,282.45 represented unverified expenses. Based on the evidence presented, we agree with respondent. Finally, the parties dispute the amount petitioner advanced to Anderson in 1984 on behalf of the Baptist Road and Barstow truck stops. Petitioner asserts that he advanced $ 103,470. Respondent determined that the advances total only $ 97,961, the difference of $ 5,509 being attributable to petitioner's original capital contribution of $ 50,000 to SH&A Enterprises. Petitioners have failed to meet their burden of proving that respondent *83 erred in her determination. Rule 142; Welch v. Helvering, 290 U.S. 111 (1933). Accordingly, we find that $ 97,961 was advanced to Anderson in 1984. In addition, we must determine what portion of the $ 97,961 is attributable individually to Baptist Road and Barstow. Petitioner testified that no allocation or accounting was made by him as to which of these entities was the recipient of these loans. Where absolute certainty is impossible, we may make as close an approximation as possible, bearing heavily upon the taxpayer whose inexactitude is of his own making. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), affg. 11 B.T.A. 743 (1928). Based on petitioner's journal entries and other evidence, we find that petitioner advanced $ 25,000 on behalf of Baptist Road and the remainder, $ 72,961, on behalf of Barstow through SH&A Enterprises. Section 166 Bad Debts
Petitioners contend that they are entitled to deductions pursuant to section 166 as business bad debts and, alternatively, under sections 162 as ordinary business expenses, 165(c)(2) as losses incurred in a transaction *84 for profit, or 165 as losses with respect to either a joint venture or an inadvertent partnership. Respondent argues that petitioner's payments and guarantees were not made in connection with petitioner's trade or business and are thus not entitled to deduction under section 166. Section 166(a) provides that a taxpayer may deduct a bad debt in full in the year it becomes worthless. Under section 166, worthless business bad debts are fully deductible from ordinary income. Worthless nonbusiness bad debts are treated as short-term capital losses. Secs. 166(d)(1)(B), 1222(2). A nonbusiness bad debt is defined as a debt other than: (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
Sec. 166(d)(2). When a taxpayer agrees to guarantee a debt in the course of his trade or business, a payment by the taxpayer in discharge of part or all of the taxpayer's obligations as a guarantor is treated as a business bad debt becoming worthless in the taxable year in which the payment is made. If the guarantee was made in the *85 course of the taxpayer's trade or business, the loss is deductible against ordinary income in the year in which the guarantor pays the debt. Sec. 1.166-9(a), Income Tax Regs. If the agreement guaranteeing the debt was entered into for profit, but not in the course of the taxpayer's trade or business, the loss is a short-term capital loss in the year in which the guarantor pays the debt. Sec. 1.166-9(b), Income Tax Regs. The taxpayer's motive is assessed at the time the guarantee was made. Harsha v. United States, 590 F.2d 884 (10th Cir. 1979). A business bad debt deduction is unavailable unless the taxpayer can establish that (1) he was engaged in a trade or business, and (2) the acquisition or worthlessness of the debt was proximately related to the conduct of such trade or business. Id.; sec. 1.166-5(b), Income Tax Regs. The taxpayer has the burden of proving respondent's determination is erroneous by showing that he sustained bad debts proximately related to his trade or business. Estate of Mann v. United States, 731 F.2d 267 (5th Cir. 1984). The relationship between a debt and the taxpayer's trade or business *86 is a question of fact. United States v. Generes, 405 U.S. 93, 104 (1972). The test for determining whether a particular debt is proximately related to the taxpayer's trade or business was enunciated by the Supreme Court in United States v. Generes, supra at 103: in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * *
The analysis of a taxpayer's dominant motivation involves a determination of whether the loan or guarantee was related to an investment or to a trade or business. When the creditor or guarantor of a corporate debt is a shareholder/investor and also an employee, mixed motives for the loan or guarantee are often present and the critical issue becomes which motive is dominant. Id. at 100. "Investing is not a trade or business". Whipple v. Commissioner, 373 U.S. 193, 202 (1963). Returns from investing -- as *87 a shareholder -- are "expectative"; they result from appreciation and earnings on the investment rather than from personal effort or labor. United States v. Generes, supra at 100-101. On the other hand, one's role or status as an employee is a business interest. Its typical nature is the exertion of effort and labor in exchange for a salary. Id.; see also Litwin v. United States, 67 AFTR 2d 91-1098, 91-1 USTC par. 50,229 (D. Kan. 1991), affd.    F.2d     (10th Cir., Jan. 12, 1993). A taxpayer's dominant motivation can also be determined by examining how the taxpayer would have benefited from the loan or guarantee had the loan not gone bad. TennesseeSecurities, Inc. v. Commissioner, 674 F.2d 570, 575 (6th Cir. 1982), affg. T.C. Memo. 1978-434. For instance, if the returns on the debt would have increased the value of the taxpayer's stock in the corporation, i.e. capital gains, then the loan was a nonbusiness investment. If the returns on the debt would have increased the taxpayer's salary, then it was a business debt. If both *88 would have resulted, then a consideration of all of the relevant facts, emphasizing the objective factors and giving controlling weight to no single factor (the Generes approach), should be used. Litwin v. United States, supra.
Respondent relies on French v. United States, 487 F.2d 1246 (1st Cir. 1973) as authority for the statement: A requirement to pay guarantees and make loans to protect a taxpayer's good credit standing does not afford business bad debt status. Respondent contends that petitioners incorrectly focus on the payment rather than the incurring of the losses in issue. However, French can be partially distinguished from the case at hand. In French, the taxpayer, a car dealer and salesman, advanced money periodically to the owner and operator of a car dealership, Pease Motors. Initially, the taxpayer advanced the funds as a friend to the owner to cover the dealership's needs. As time progressed, the taxpayer's advances were reciprocated with stock in the company, until the taxpayer gained full ownership in 1960. In 1961, the taxpayer signed a personal guarantee on a company *89 loan, which he had to fulfill when the company failed in 1964. The court properly focused on the circumstances surrounding the guarantee in 1961 and not the payment in 1964, a payment which the taxpayer described as necessary to protect his sources of credit in his other dealership. The court stated that "If taxpayer did not make the guarantee originally as a business obligation, it did not become such by the mere fact that his paying in cash, * * * may have avoided business complications." Id. at 1248. In the case at hand, when petitioner incurred the obligation to United Bank and made advances on behalf of Baptist Road to Anderson, his dominant motivation was the preservation of his real estate development business. Petitioner's dominant motivation in this instance will be discussed below in greater detail. However, as discussed below, we do find French applicable to the advances made by petitioner to Anderson on behalf of the Barstow truck stop and to the payments made to Silco pursuant to the settlement agreement. Petitioner initially entered into SH&A Enterprises, which purchased Barstow, as an investment and therefore the subsequent advances *90 and settlement payments do not qualify for bad debt treatment. Petitioners argue that their payments to United Bank, on behalf of the Baptist Road and Barstow truck stops, and pursuant to the settlement agreement with Silco, constituted business bad debts. They maintain that their motivation in incurring the debts was to preserve petitioner's reputation and credit standing, both of which were imperative to maintain his highly debt-leveraged real estate development business. In addition, petitioners argue that they had only invested a small amount of money in the truck stops (approximately $ 350,000 including advances) in comparison to the multimillion-dollar credit line at stake in petitioner's real estate operations ($ 8 to $ 15 million). Therefore, their motivation to maintain the soundness of the real estate operations clearly predominated over their desire to preserve the investment in the two truck stops. Petitioner relies on our decision in Smith v. Commissioner, 60 T.C. 316 (1973). In Smith, the taxpayer operated SmithGravel, a construction business. The taxpayer subsequently formed Smith Petroleum and entered into the oil-well-servicing *91 business. Despite its initial success, Smith Petroleum began experiencing financial difficulties. In response, the taxpayer advanced funds from SmithGravel to Smith Petroleum during tax years 1963 to 1965. We found that the taxpayer's primary motivation in advancing the funds was to make Smith Petroleum profitable and, therefore, the losses arising therefrom were nonbusiness in nature. Despite the fact that Smith Petroleum shut down by the end of 1965, the taxpayer nevertheless advanced additional money to Smith Petroleum in 1966 to pay its creditors. Even though the taxpayer had no prospect of recouping his investment in Smith Petroleum, the company had come to be considered a part of SmithGravel's operations. Accordingly, we held that the taxpayer's primary motivation in the 1966 advancement of funds was to protect SmithGravel's credit rating, thus making the losses from those advances business in nature. Id. at 320. Respondent contends that petitioners are not entitled to a section 166 deduction for business bad debts because the I-25 Partnership, which owned Baptist Road, and SH&A Enterprises, which had interests in both Barstow & Fountain, *92 were never integrated into petitioner's real estate business like the businesses in Smith. However, this lack of integration does not preclude our finding that a section 166 business bad debt deduction is appropriate in this case. Rather, our primary inquiry, under United States v. Generes, 405 U.S. 93, 104 (1972), is whether petitioner's dominant motivation was the protection of his real estate development business. To make our primary inquiry, we have divided the deductions in issue into three components: (1) The Anderson component, (2) the United Bank component, and (3) the Silco component. a. Anderson Component
Petitioners contend that the advances to Anderson or Anderosa for the benefit of the Barstow and Baptist Road truck stops qualify as section 166 business bad debts. We previously found that, of the $ 97,961 advanced to Anderson in 1984, $ 25,000 is attributable to Baptist Road and the remainder of $ 72,961 is attributable to Barstow. We will address each of these advances individually. 1. Advances on Behalf of Baptist Road Truck Stop In the case of Baptist Road, if the truck stop went out of business because of the absence *93 of a lessee, the I-25 Partnership would have been unable to meet its mortgage obligations to Columbia Savings. Both petitioner and his accountant, Rick Brown, testified that such a default would have triggered a demand for all the outstanding debt owed by petitioner's real estate development business. We find their testimony to be credible. Respondent concedes that petitioner's I-25 Partnership had a lessor-lessee relationship with Anderosa, Anderson's corporation. However, respondent argues that the business relationship between Anderosa and the I-25 Partnership was too remote to have been the dominant motivation for petitioner's loans to Anderson and related entities. We disagree. Baptist Road, through Anderosa, paid rent to the I-25 Partnership, of which petitioner was a general partner. Therefore, the protection of his distributive share of a stream of rental income was at stake. Additionally, if the truck stop could not pay its rent, the I-25 Partnership could not meet its obligation on the $ 675,000 mortgage, owed to a third party bank. We agree with petitioner's assertion that a default on this mortgage would have damaged his real estate development business, which *94 was dependent on obtaining significant amounts of financing. Accordingly, we find that petitioner's dominant motivation in advancing $ 25,000 on behalf of Baptist Road was to protect his real estate development business. Cf. Milbank v. Commissioner, 51 T.C. 805 (1969). Petitioner's deductions of the payments as business bad debts under section 166 was proper. 2. Advances on Behalf of Barstow Truck Stop Petitioner contends that when he advanced funds to Anderson in 1984 to cover Barstow's expenses the truck stop was performing so poorly that SH&A Enterprises could not afford to meet its obligations to Silco. Without his assistance, SH&A Enterprises would have defaulted on its obligations to Silco and such a default would have triggered a demand for the outstanding debts of petitioner's highly leveraged and troubled real estate development business. Respondent contends that there was no proximate relationship between petitioner's real estate development business and the business of SH&A Enterprises that could serve as the dominant motive for his loans. We agree. The circumstances surrounding petitioner's involvement in SH&A Enterprises differ *95 substantially from those in Baptist Road. First of all, petitioner testified that he looked solely to the sale of the truck stops, Barstow and Fountain, for repayment of moneys he advanced on behalf of SH&A. This statement leads to the conclusion that he regarded the money as an investment. Second, unlike Baptist Road, petitioner received no rental income from his participation in SH&A; nor did he receive any salary. Finally, no mortgagee or third party banks were involved in the obligations, only the parties to the purchase agreement. A default on the obligations to Silco would not have had the same impact on petitioner's real estate development business as a default to a third party bank. Therefore, we find that petitioner's advances of $ 72,961 on behalf of the Barstow truck stop to Anderson were not proximately related to his trade or business. Accordingly, deduction of the payments under section 166 was improper. However, the payments qualify as nonbusiness bad debts entitled to treatment as short-term capital losses under section 166(d). Petitioner argues, in the alternative, that the advances made to Anderson on behalf of Barstow qualify for deduction under section *96 162. Section 162 allows for deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". We have previously found that petitioner's involvement in SH&A Enterprises, and consequently Barstow, was not proximately related to his trade or business. Therefore, the advances made by petitioner on behalf of Barstow do not constitute trade or business expenses. Accordingly, no deduction is allowed under section 162. b. United Bank Component
In 1985, petitioner rescued Anderosa, whose bank accounts had been emptied by United Bank to cover the debt of SH&A Enterprises, by signing a promissory note as guarantor of SH&A Enterprises' line of credit at United Bank. Pursuant to that guarantee, petitioner paid $ 36,000 to the bank during 1985. If petitioner had not intervened, United Bank threatened to enforce a lien on Baptist Road's personal property. Like the arguments made in relation to the advances made on behalf of Baptist Road, petitioner asserts that if United Bank had enforced its lien on the truck stop's personal property, the operations would have ceased and thus the I-25 Partnership would not have been *97 able to meet its obligation on the $ 675,000 mortgage owed to Columbia Savings, which would have caused substantial damage to his real estate development business. We agree. Respondent again argues that payments of amounts to protect a taxpayer's credit standing do not afford business bad debt status. French v. United States, 487 F.2d 1246 (1st Cir. 1973). As we previously stated, the focus of inquiry on a taxpayer's dominant motivation is at the time the taxpayer incurs the obligation, not when he makes the payment. In French, the taxpayer initially incurred the obligations as an investment, but only later claimed the payments as necessary to protect the credit rating of his entire trade or business of being a car dealer. In the case at hand, the time of incurring the obligation and beginning actual payment are simultaneous. Petitioner clearly testified that he incurred the obligation to prevent the Baptist Road truck stop from ceasing operations, defaulting on the $ 675,000 mortgage, and damaging his real estate development business. We find his testimony to be credible. Accordingly, we find that petitioner's dominant motivation for guaranteeing *98 the debt to United Bank was to protect his own business. Therefore, petitioners are entitled to deduct as business bad debts, under section 166, the $ 36,000 plus $ 1,460.98 in interest in tax year 1985. c. Silco Component
The next deductions in issue were claimed by petitioner as a result of the Agreement for Mutual Release and Settlement of Claims entered into with Silco and Tomahawk on March 31, 1985. In accordance with that agreement, petitioner paid $ 100,000 at the signing of the settlement and an additional $ 47,646.80 pursuant to the promissory note provided by the settlement agreement. The combined amount of $ 147,646.80 is in issue. Respondent argues that petitioners failed to meet their burden in establishing that the obligations which petitioner incurred and guaranteed on behalf of SH&A Enterprises were proximately related to petitioner's trade or business. As we discussed in relation to the advances on behalf of Barstow, we agree with respondent that petitioner's dominant motivation in incurring the initial obligations on behalf of SH&A Enterprises under the purchase agreement was investment oriented. However, these initial obligations were canceled by *99 the settlement agreement with Silco. The amount in issue, $ 147,646.80, arose because of the obligations petitioner incurred as a result of that settlement agreement. Accordingly, our inquiry remains focused, under United States v. Generes, 405 U.S. 93, 103 (1972), on determining petitioner's dominant motivation at the time of incurring these settlement obligations. In determining petitioner's dominant motivation at the time of incurring the settlement obligation, we find the decision in French v. United States, supra, to be particularly applicable. As in French, petitioner's dominant motivation in becoming involved with SH&A Enterprises was investment oriented. As we previously discussed in relation to his advances on behalf of Barstow, petitioner had no salary or employment to protect; no income stream was involved; he looked solely to the sale of the truck stops for the repayment of moneys he advanced on behalf of SH&A Enterprises; and the settlement payments were made directly to Silco with no involvement of third party banks. In French, the taxpayer also initially incurred the obligations as an investment, *100 but only later claimed the payments as necessary to protect the credit rating of his entire trade or business. Id. at 1248. We find the same circumstances present in this case. As in French, petitioner testified that he made the payments under the settlement agreement to protect the credit rating of his already existing real estate development business. However, we find that his testimony does not change our initial finding that his advances on behalf of SH&A Enterprises were not made to protect his own business. Petitioner relies on our decision in Smith v. Commissioner, 60 T.C. 316 (1973). He argues that, as in Smith, the settlement payments must be separated from the initial obligations under the purchase agreement in order to find that his dominant motivation was the preservation of his real estate business' credit rating. However, Smith can be distinguished from the case at hand. In Smith, Smith Petroleum was defunct and had come to be considered as part of SmithGravel. Additionally, the advances made by the taxpayer were to pay off creditors. In the case at hand, SH&A Enterprises was not *101 defunct at the time of entering into the settlement with Silco and no testimony was offered revealing that SH&A Enterprises had come to be considered as part of petitioner's real estate development business. Furthermore, petitioner's payments under the settlement agreement were made to Silco and not to outside creditors. We do not agree with petitioner's assertion that a default on these settlement payments would have had the same impact on his real estate business' credit rating as a default to a bank or mortgagee. In conclusion, we find that petitioner's dominant motivation at the time of incurring the settlement payments was not the protection of his real estate development business. Accordingly, the deduction of $ 147,646.80 as a business bad debt under section 166 was improper. However, it does qualify as a nonbusiness bad debt, with treatment as a short-term capital loss under section 166(d). Petitioner argues, in the alternative, that the settlement payments qualify for deduction under section 165. Section 165(a) allows, as a deduction, "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Subsection (c) limits the deductibility *102 of losses of individuals to three categories: (1) Losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business, and (3) casualty losses. However, section 165 does not apply to payments made in discharge of a guarantee. Such payments are worthless nonbusiness debts in the taxable year in which the payments are made. Sec. 1.166-9(b), Income Tax Regs.; see also Black Gold Energy Corp. v. Commissioner, 99 T.C.     (1992). Furthermore, the Court of Appeals for the Ninth Circuit, has held that payments to be released from liability as a guarantor are not considered "profit transactions", the losses from which are deductible under section 165(c)(2). The available deduction is a nonbusiness bad debt. United States v. Hoffman, 423 F.2d 1217 (9th Cir. 1970). Accordingly, petitioner's payments made pursuant to the settlement agreement with Silco do not qualify for deduction under section 165. Section 1244 Deduction
Our final determination is whether petitioner's deduction of his initial contribution of $ 50,000 *103 to SH&A Enterprises qualifies under section 1244 as a loss on small business stock. Since we have previously found that petitioner was not a shareholder in SH&A Enterprises, the $ 50,000 contribution is characterized as debt, not equity, and therefore a section 1244 loss is not available. Additionally, we must address whether petitioners properly claimed the $ 50,000 contribution as a business bad debt on their 1985 tax return. As with the other section 166 deductions, we must focus on petitioner's dominant motivation and whether the contribution is proximately related to petitioner's real estate development business. United States v. Generes, 405 U.S. 93, 104 (1972). We are not convinced that petitioner's dominant motivation in making the contribution was proximately related to his real estate development business. As we previously discussed, petitioner did not receive any salary or rental income stream through SH&A Enterprises. In addition, the contribution was not made to sustain his real estate development business's credit rating and no third parties or banks were involved. Therefore, we conclude that the $ 50,000 contribution to SH&A Enterprises *104 does not qualify as a business bad debt deduction under section 166. However, it does qualify as a nonbusiness bad debt, entitled to short-term capital loss treatment under section 166(d). In conclusion, we find that the payments made by petitioner to Anderson on behalf of Baptist Road and to United Bank qualify as business bad debts under section 166 and were, therefore, properly deducted. In regard to the $ 50,000 contributed by petitioner to SH&A Enterprises, we find that the contribution does not qualify as a loss from small business stock under section 1244 nor as a business bad debt deduction under section 166. In addition, we find that petitioner's advances to Anderson on behalf of the Barstow truck stop and the payments made to Silco pursuant to the settlement agreement do not qualify for deduction as business bad debts under section 166. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Anderson owned 95 percent of the Anderosa stock; her family members owned the remaining 5 percent.↩
3. Subsequent to the 1984 advances, Tomahawk executed a series of promissory notes representing obligations of SH&A Enterprises in favor of petitioner. The promissory notes represented a portion of the advances and were payable on demand or on the sale of Barstow.↩
4. In 1984, petitioner advanced funds to Anderson on behalf of both the Baptist Road and Barstow truck stops. The total amount advanced to both truck stops is disputed by the parties. In addition, the record does not contain the exact amounts allocable to each truck stop. These disputed amounts are discussed below.↩
5. The parties to the settlement were: SH&A Enterprises; Tomahawk; Anderson; Gregory S. Anderson; Silco; Silco Fuel Inc., d.b.a. 181 Realty, Inc.; and the original Tomahawk shareholders (Robert A. Silverberg, John R. Owens, and Don Roth).↩
6. See supra↩ note 4.
7. Petitioner had not personally guaranteed SH&A Enterprises' line of credit with United Bank when it was originally established.↩
8. Petitioner conceded at trial that the amount claimed should be decreased from $ 55,668.58 to $ 54,743.43.↩